Customs. Good morning, Your Honors. May it please the Court, David Bauer on behalf of Panjiva and Trade Data Services, the appellants in this case. With me is my co-counsel, Sharon Yeaman, and I'm reserving three minutes for rebuttal, please. Again, could you help me out with a little background? What's the big deal? Why until 1996, it was only vessels, meaning not airplanes. In 1996, at least for a while, it was changed to have manifests of airplanes, too. What's the underlying reason for that distinction from your point of view, rightly or wrongly? Why was there historically a distinction between the two? Well, historically, most shipments, international shipment, was by seagoing vessels. And then Congress recognized that, I believe it was 1984, and said, well, there's a lot of counterfeiting and other issues, so let's make that information publicly available. There was a ballooning with the development of air traffic, air cargo, in the late 70s, 80s, early 90s, and that became much more of an issue. Of course, it's public availability. Public availability, because what, and this is laid out very well in the amicus brief, and we addressed it somewhat with the legislative history of the Anti-Counterfeiting and Consumer Protection Act, both in the opening brief, and we dealt with it slightly in the reply. There was a ballooning of the small weight, small size, high value cargo and air traffic. I believe there was, amicus laid out 250 million parcels or items per year now. I know that 1996, when the ACPA was enacted, there was $200 million of valuation that the Congress estimated to support the enactment of the ACPA. And it's just grown exponentially since then. And it's a... But why the, and then why the, what would be the reason to distinguish between public review of one versus the other? Is it that it's more dangerous to have public review over these small packages, high value packages? As I was preparing for this argument, and I was using my wife to help me moot court, and she kept asking me that same question. And I had to confess my ignorance. And, you know, it would be speculation. I mean, that is the question. And for five years during the Clinton administration, from 96 to 2001, in fact, they interpreted this provision the way we did. And as we noted, in the Federal Register, they issued a notice of intent to have an intention to promulgate regulations. They never got to the notice of proposed rulemaking. But they thought it would be a good idea somewhere over the horizon. And that stopped. But so there is a history that at least the executive branch, the customs department, thought it would be a good idea to do this. And for whatever reason, I don't know, they changed their mind. So no, and there's, I mean, I've read the sections of the briefs on legislative history, but there isn't, is there a clear explanation anywhere of why there is this changing of the mind and then so abruptly just a few months later? No. And I will speculate. Therefore, you argue that it's part of the, we don't need to get there in any event. No, we don't. I would, and this is why we repeated through our briefing that it is the duty of courts reviewing these provisions to not speculate, to not interpolate what they think might have happened, just go in the four corners. Speculating, I'm trying to understand. No, I understand. But in order to come to some understanding. I'm speculating somewhat. Oh, well, there's an absence, there's an absence of data. And I mean, there does, there clearly was a mistake made somewhere along the way. Somewhere along the way. And one might speculate that this was an 11th hour thing that a lobbyist slipped into the Technical Corrections Act in the respondent's briefing, excellent briefing, I will say, they, they make it sound like section three, sub a sub three was the entire reason for the Technical Corrections Act. Well, in reality, it's a 45 page bill with tiny little print, about nine point font, 59 sections that addresses hundreds and hundreds, if not thousands of sections that it amends. One, I, I have conjectured with my clients that it's possible a lobbyist slipped into, into the 11th hour. It didn't go through any committees. What lobbyist for whom, who would have that interest? I'm just, I don't mean lobbyists for whom. I mean, what industry would have that interest in doing that? I don't know. I mean, I, again, I'm speculating, but again, this is why we limit our review to what the court. Part of that is when you line up these provisions and you look at the language, it, it, there's a, there's a reasonable argument that it just absolutely makes no sense. What happened? You cannot logically follow these amendments. You know, who was trying to achieve what here? And consequently, the questions that my colleagues have asked you, in which you, I won't say you were ducking, but you, I think you can't really say there's no answer to them, or, or, you know, complicate our lives. Well, my response is twofold. First, we address a way to make consonant the legislative history of the TCA at page 18, 19, 19 and 20 of our reply brief, and that Congress could be imputed to have enacted the TCA's relevant section here to underscore that it applied only to seagoing, that it applied both to seagoing vessels and because it was written in the disjunctive. Can you think of any reason in the entire world why this regime should apply to vessels and not air? No, it should apply to both. And if Congress made a mistake, as we noted in page 10 and 11 and 12 of our passing cases, the Supreme Court said it counseled against assuming inadvertence on the part of Congress. And it said in Hamer, we resist speculating whether Congress acted inadvertently. And in Henson, it said, to the extent there remains a need to correct statutory text to max unrealized congressional intent, these are matters for Congress, not this Court to resolve, close quote. So if Congress botched the job, we look at the text in the section 431C sub 1, which itself is not ambiguous. Yes, it repeats vessel, but the phrase aircraft manifest must be publicly, aircraft manifest information must be publicly available, remains. It was not repealed and it must. References to airport. Any airport in subsection D3F. So they remain. Respondents discount that as mere surplusage. We can overlook it. There's nothing going on here. Move along. Thank you very much. But it does remain and it goes. And also it's important, it's relevant. It's a small detail, but I was reviewing last night and I noticed that the title of says, yes, title of section three, technical and other conforming amendments. And that's not a title that suggests substantive changes of the type that the respondents are arguing here. It's bookkeeping, it's clarifying, moving commas around. It's a technical, this, what respondents are urging here is not a technical or conforming amendment. There's nothing to conform to. The law before the TCA section 3A3 was enacted was to allow aircraft manifest data to be publicly available. And the title suggests, I mean, and under Chevron, we look at the text and the context and the title as part of the context, suggests that substantive amendments in that section were not contemplated by Congress. You save some time for rebuttal. Yes. Thank you from the government. Good morning, your honors. May it please the court, Stephen Chotkin, assistant United States attorney for the Southern district of New York. I represent the government, the defendant, Matt Belli. I also represented the government in the proceedings below. Let me ask you judge Parker's question. Is there any reason in the world to distinguish between the whole world, the aircraft and seagoing vessels for these purposes? Well, in fact, there is. And we pointed it out in our brief on page 23. If you look at congressional enactments since that time, and particularly after 2001, September 11th, there are a series of legislation that specifically deals separately with security requirements for aircraft manifests, with security requirements for waterborne vessels. Both are sensitive to be sure, but it's a matter of common sense that Congress necessarily understands that putting out there what kind of — The reason is that the security requirements are different? Is there a reason? For planes versus ships. Certainly. So we know, for instance, that lithium-ion batteries due to the news are specifically sensitive to blow up in air or to tampering. I think it's common sense that to have publicly available which airline, which cargo shipment contains specific examples of sensitive items is something that Congress would say, you know, we don't want versus — because I think if anyone who would want to tamper with a certain shipment, knowing that, for instance, this particular flight carries lithium-ion batteries, they know that they can target that flight, you know, much more easily in a way than, you know, not knowing that specific piece of information. So — but there's nothing that either of you have pointed to in connection with the 84 enactments or the July 96 or the October 96 that says anything like that. That's correct, Your Honor. But to the extent that there's a set of history, it supports the government's reading. So the final Senate — Well, that begs my question. I mean, I'm not — I'm not convinced that there is such history. So the Senate report, Your Honor, that we cite in our briefing, that specifically addresses this — this provision. And the cites of that is Senate Report 104-393. And can you give me a record — an appendix citation? For Westlaw, Your Honor, or — Or what you just mentioned. Or maybe if it's easier, if it's more brief. Whichever is easier. Certainly. In the brief, it is — So we can double — so we can double-check what you're saying. Certainly. Page 16 of the brief — and we also mention it again in footnote 2 of our brief as well. But this is the — It's your — you're telling us that there were security concerns that animated these amendments. I can say that for certain, Your Honor. To the extent that we are in the land of speculation, Pangeva's argument was there's no possible reason under the sun why Congress would want to treat these two things differently. All we're pointing out is, look at what Congress has done since 1996. And there are numerous examples in which Congress has enacted legislation treating the two differently. I mean, that's all I could say on that point. At least in hindsight, there may have been a good reason. Absolutely. Now, going back to what legislative history and statutory construction tools we have, the Senate report — and it is typical of Congress's actions with this Act, quite pithy — but it says, The provision amends 431c1 of the Tariff Act to clarify that the reference in this provision only applies to vessel manifests, and vessel was specifically defined in the Tariff Act and has been since 1930, and not to other types of manifests. Whatever Congress's reasons in doing so, that report makes it clear in unambiguous terms the end result they wanted was this provision can only apply to vessel manifests, not to other types of manifests. So, again, this is not a model of legislative drafting clarity, to be sure, which is why we have this ambiguity. I remember that there is a method by which we can — obviously, we can't certify questions to Congress, but can suggest to Congress that perhaps they ought to take a closer look. I'm not sure this Congress is quite in the mood to take a closer look at this question at the moment, but I think there is a possibility of doing this, and I would assume if there is, this would not be a bad case in which to do it. Correct, Your Honor. If this Court affirms Judge Atkin's analysis, which is fairly thorough about the legislative history that you're asking about and other considerations, certainly Congress would be made aware. Just as Congress — If we reverse, I would think Congress would want to be aware. Certainly. But in terms of how that works, Congress has been aware of this status quo since 1996, we have to presume, including in 1998 when an amendment was proposed to change back this very provision to include aircraft. The House actually passed that amendment, but the Senate voted it out. Now, why would Congress be contemplating an amendment to change the language back to what Pangeva is asking for if Pangeva's argument is that was the understanding Congress had? At least part of Congress was not persuaded that it was dangerous to do that. That is to say, they had not foreseen 9-11 media. They had not, but for whatever reason — Maybe Congress didn't think it was necessary because the wording is plain. I mean, again, we're speculating. Certainly. If you look at the language, there's clearly a typo. So one's instinct is to strike one of the vessels. And then when you look at the plain wording, including the other subdivisions which refer to aircraft, airport, airport, it's — there is no ambiguity. Well, a couple of questions about that, Your Honor. So there's ambiguity if you continue to look at the U.S. Code language, which is the result of what the Scrivener did. What the actual language said following the first enactment in 1996, in July, was information when contained in such vessel or aircraft manifest shall be made available. The October statute directed that such manifest should be stricken and replaced with a vessel manifest. But the problem is, of course, such manifest doesn't appear in sequence anymore in the statute. It was a nonsensical amendment. It didn't make sense anymore. So what do we do with that? Right. Therefore, there's an inherently unclear meaning to the statutory command of Congress in the organic statute. Therefore, we have to look at the legislative history and the canons of statutory construction that we have available to us. Let's get out of speculation. Let's use the tools that courts have, which is, okay, Congress gave this command. It's literally nonsensical. Even the Scrivener — Those commands don't interpret it so that there's surplusage. And we're going to have lots of surplusage if we interpret it the way that the government is suggesting. Well, respectfully, under surplusage, it can be tolerated in this case for a number — for a couple of reasons. First, there's no hardline rule that says all manner of surplusage renders an act ineligible. In fact, the doctrine goes to the contrary. You have to tolerate — Is there a case that — where a statute is otherwise plain in its meaning, but clearly there was an error, and then a court has to interpret it? Is there a case like that? I think those cases are legion, Your Honor, some of the cases that we cite. But the point is, in a case like that, what a court can do is, rather than speculate, oh, Congress must have made an error, the courts have to presume that Congress is aware of prior legislation when it enacts something, including something four months later. It's a presumption that is rebutted here because its amendment is completely nonsensical. Nonsensical. Well, but — And the legislative history, frankly, is not clear either. So what are we left to do? I would say, Your Honor, that that line from the Senate report, which comes from the very week that it was enacted, is clear. This reference refers only to vessel and not to other types of manifests. I don't know how much clearer — you know, short as it is — that that intent could be. We know from Justice Scalia that it's, you know, far from certain that the Senate paid any attention to that. Finance committee people may have, but the notion that that informs what the Senate was thinking is, if they weren't paying attention to the — A stretch. — if they weren't paying attention to the language of the statute, it's a little hard to say they were when somebody sat down and wrote a — I understand, look, you're both caught in the same thing. It's not your fault. Right. We're trying to figure out what this Congress did 23 years ago. I mean, what I would say about that is — What about the argument that the Clinton administration interpreted it this way for five years? So that's a stretch by any means. They point to two references in the Federal Register, as counsel described it, a to-do list of to-do things, potentially. And our argument is that that is hardly the same as, for instance, in 1980, when the first requirement for ships was passed, the Department of Treasury issued regulations within the year. So the fact that that to-do list remained on the Federal Register does not equate to some notion that the Clinton administration had that position and then sort of inexplicably gave it up. If anything, the status quo has been Congress and the executive branch has understood for the past 23 years otherwise. Let me ask you this. Was the — for a period of time, three months, there was a reference to aircraft. Was that ever implemented? No, Your Honor. No regulations were implemented. So the manifest information has never been made public? No. And I see my time is up, but I could address just a couple of points that counsel made, because I think they're important. Briefly. First, the argument that the title of the act being called a technical act matters is incorrect for a couple of reasons. One, this Court, in a case called Drax in 2003, said, look, you can look to what a statute is called, including a technical act, but look to the substance of the amendment. And this actual technical act — Right. But the last thing I would say is this particular technical act is not just commas and periods. If you look at it, there are — it's several dozen pages and includes substantive changes to things that can be duty, substantive changes to rights that are created by shippers. This is, notwithstanding its title, a highly substantive statute. All right. Thank you. We'll hear the rebuttal. Thank you. In response to the question about who might have wanted to insert this, my wise and knowledgeable co-counsel informs me that the Air Transportation of America Association, they're lobbyists, and they were the only entity to testify in favor of the TSA amendment in this regard. Airlines might not have wanted it. Maybe, yes. Is it too transparent? I don't know. Maybe. But we're speculating. I mean, anyway, that's an answer to that. With due respect, Respondent's case really essentially boils down to a situation of manufactured confusion. The statutory text is clear. They're trying to muddy the water by inverting the proper role, proper process of analysis by — they go to legislative history and try to make ambiguous the statutory text, as opposed to the proper way, which is look at the statutory text and only at ambiguous do you go to legislative history. And the speculation about there might be some security or hazard issue behind this is completely unsupported, certainly within the text of the statutes, but also there's nothing in any legislative history, either for the ACPA or the TCA, that remotely addresses this. So my ingenious opposing counsel, you know, came up with this because, you know, it's trying to dress up a problem that cannot be avoided. As far as the redundancy of the enactment of the TCA, it is — it's probably our hardest issue to get around. My response is that the retroactive date for Section 3, sub a, sub 3, of December 1993 would also render that completely superfluous because in December of 1993, the only entities that were bringing goods into America that required that their manifest information be publicly available were seagoing vessels. So for this amendment to be made retroactive to December of 1993 was also completely redundant. So perhaps we just take the position that the redundancies cancel each other out and, of course, we go back to the clear text of the statute, which says aircraft manifest information should be publicly available. And that's the beginning, middle, and end of our case, in a sense. That language remains to this day. It hasn't been expressly repealed. It hasn't been implicitly repealed. And Respondent's case is the thinnest of thin reeds where they — I get the — from that date to this, they have not, in fact, been publicly available. That's correct. They've not ever been — there's never been an administrative mechanism as there is — but as a matter of fact, it hasn't been because of this. Yes. The agency never got around to promulgating the regulations that Congress mandated. How are ship manifests made public? There's a process that Customs and Border Protection has established where people ask for the information, it's produced — I understand there's fees that change hands and it's publicly available. It takes a while to get it? I think it takes — my understanding is it takes a while, but there's a regular — it's an ongoing process. And the people who take the information, such as our clients, regularly avail themselves to this process. So it's sort of like a pipeline that's constantly full and — You can't just go onto a website and look up — You know, Your Honor, I don't know that for sure. If you like, we can provide that. That's all right. Thank you. Thank you, Your Honor. Thank you. Yes. I like this, to have a good time. Actually. Oh, well. Have a good time. Brett? I'm actually starving, so I'm going to be a little quiet. Oh, it was fine. That happened so fast as well. That's what you should do. Here we go. Yeah, it's okay that you're right in the middle of something.